UNITED STATES of America

v.

John DiSALVO.

Crim. No. 83–00041–01.

United States District Court,
E.D. Pennsylvania.

Oct. 24, 1989.

Kristin R. Hayes, Asst. U.S. Atty., Philadelphia, Pa., for U.S.

F. Kirk Adams, Media, Pa., for defendant.

## OPINION

### LOUIS H. POLLAK, Justice.

The Government has moved for reconsideration of my Memorandum and Order of July 11, 1989. I there sustained the Report and Recommendation of Magistrate Hall that Mr. DiSalvo's supplemental motion pursuant to section 2255 be granted, that his conviction be vacated, and that he be accorded a new trial. The basis for Magistrate Hall's Report and Recommendation, and for my Memorandum and Order, was Magistrate Hall's determination that (1) notwithstanding Mr. DiSalvo's expressed desire to testify, his attorney did not call him as a witness, and (2) Mr. DiSalvo's inability to exercise his right to testify on his own behalf was not harmless error.[1]

The Government's motion for reconsideration rests on *United States v. Martinez*, 883 F.2d 750 (9th Cir.1989), a case decided by the Ninth Circuit some weeks after the entry of my Memorandum and Order. In *Martinez*, the court of appeals affirmed the district court's denial of a motion for a new trial. There, as here, a defendant who told his lawyer that he wanted to testify was not called to the stand.

The *Martinez* court was unanimous in its acceptance of the proposition that the defendant's right to testify is one of constitutional dimension. However, the court was divided on how that constitutional right is to be vindicated. In the view of the majority, speaking through Judge Noonan, the trial court "has no duty to advise the defendant of his right to testify, nor is the court required to insure that an on-the-record waiver has occurred. The defendant's conduct provides a sufficient basis from which

to infer that the right to testify has been waived." 883 F.2d at 760. Judge Reinhardt, in dissent, took a more spacious view of the trial judge's obligation to insure a defendant's understanding of his right to testify. Further, on the record presented by the particular case before the court, Judge Reinhardt disagreed with his colleagues on whether waiver could properly be inferred from the "defendant's conduct."

The factual record which, in the majority's view, warranted an inference of waiver was summarized by Judge Noonan at the outset of his extended and very thoughtful opinion. The closing paragraphs of Judge Noonan's summary are as follows:

> The decision not to call Martinez was not based on the belief on Weight's part that Martinez would have perjured himself on the stand. Martinez wanted to offer exculpatory testimony that would have contradicted other testimony but in Weight's view did not constitute perjury. Weight did not discuss with Martinez the option of Martinez approaching the trial judge and saying that he was having a problem taking the stand because Weight was holding him back. In Weight's opinion, Weight had made "the strategic and tactical decision that he should not testify, notwithstanding his request to do so."

883 F.2d at 752.

At the close of his opinion, Judge Noonan explicated the finding that Martinez had waived his right to testify:

> That he knew that the right existed, i.e., that he knew the state could not bar him from being a witness, is plain from his colloquies with his lawyer. Educated by television and past courtroom experience of his own, Martinez had seen criminal defendants take the stand. He knew he had a right to be heard if he chose. His lawyer did not deny that he did. The defendant's knowledge of his right led him to insist. Respect for his lawyer's judgment eventually led him not to persist.

883 F.2d at 760–761.

1. Attached hereto as Appendix A is the Report and Recommendation of Magistrate William F. Hall. Attached hereto as Appendix B is the Memorandum of July 11, 1989.

In the case before this court, Magistrate Hall started from the same constitutional premise as the *Martinez* court. In Magistrate Hall's view "DiSalvo had a constitutional right to testify at his trial...." (Report and Recommendation at p. 11). Further, according to Magistrate Hall, Mr. DiSalvo's "right was abridged by his not being called to testify by [Robert] Simone [Mr. DiSalvo's lawyer] unless he made a free and meaningful decision not to testify." *Id.* Magistrate Hall's findings and conclusions with respect to the waiver issue were as follows:

> ... [B]ased on his limited recall of the events relevant to this issue and Mr. DiSalvo's unequivocal testimony, I conclude that Simone did not advise DiSalvo of his right to testify despite DiSalvo's having told him that he wanted to testify. Further, I conclude that Simone did not provide him with relevant information that would have enabled him to make a meaningful decision to testify or not to testify. Indeed, the evidence supports a conclusion that DiSalvo did not make the decision not to testify but that Simone made that decision in electing instead to "play it by ear" or by limiting the defense to an attack on the government's interpretation of the word "wet" allegedly used as a code word in the telephone conversation between DiSalvo and Maleno by introducing a weather report and by attempting to show an unlawful prosecution motive by the testimony of the FBI Agent. (Report and Recommendation at page 16, footnote omitted).[2]

 I agree with Magistrate Hall and the Ninth Circuit that a defendant's entitle-

ment to testify is a constitutional right. See, in addition to the majority and dissenting opinions in *Martinez*, Judge Godbold's powerful dissent in *Wright v. Estelle*, 572 F.2d 1071, 1074 (5th Cir.1978). On the facts presented in *Martinez*, the majority found waiver. On the different facts presented in the case at bar, Magistrate Hall found no waiver—and I have endorsed and continue to endorse that finding. To the extent that the two cases are fact-specific, the *Martinez* finding of waiver does not dictate a different result in the present case. To the extent that the majority in *Martinez* is to be understood as holding that a defense attorney's decision not to call the defendant to the stand conclusively establishes client-waiver, I disagree for the reasons developed at length by Judge Reinhardt in his careful dissenting opinion.

Accordingly, in an accompanying Order the Government's motion for reconsideration will be denied.

## ORDER

For the reasons stated in the accompanying Memorandum, the Government's motion for reconsideration of the Order of July 11, 1989 approving Magistrate Hall's Report and Recommendation is DENIED.

## APPENDIX A

### REPORT AND RECOMMENDATION

WILLIAM F. HALL, Jr., United States Magistrate.

Presently before the court is a motion and supplemental motion under 28 U.S.C. § 2255 to vacate, set aside or correct sen-

---

**2.** Earlier in his Report and Recommendation, Magistrate Hall sets out the following DiSalvo testimony:

> [W]e argued back and forth and we never came to a different thing.... We never made decision on whether I should take the stand or not....
> Then I said, "there was two books in the case, two catalogues." ... I wanted to explain about the books. And Mr. Simone for some other reason I didn't know at the time because I didn't know that much about the law, I'm a layman. I don't know about law. And we went back and forth and we stood out

there for about a half an hour. So he said "We better get back inside." I said "Well, what are we going to do?" He said "We'll play it by ear."
> So we get inside ... And he called one witness to the stand, an FBI Agent ... And it never—before I knew it, the defense rested. And that was it, and the case was over as far as I was concerned. But I never, like I didn't know I could get up and say wait a minute, your Honor, I want to say something or whatever. I never got a chance to say that because I didn't know procedure at the time. (Report and Recommendation, page 12).

tence. The movant, John DiSalvo (DiSalvo), contends that he was denied his Sixth Amendment right to the effective assistance of counsel because of his attorney's conflict of interests and his constitutional right to testify on his own behalf. An evidentiary hearing was held on the motions at which the testimony of DiSalvo, Robert F. Simone, Esq. (Simone) and Thomas DelGiorno (DelGiorno) was given. Based on the credible evidence produced, the trial record, and the docket entries and after consideration of the memoranda of law submitted by counsel, I make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. On February 8, 1983 the defendant was indicted by a Federal Grand Jury on charges of conspiracy to distribute methamphetamine and unlawful use of a communications facility

2. Simone entered his appearance for DiSalvo on February 14, 1983 and represented DiSalvo until after he was sentenced on September 30, 1983.

3. A non jury trial before the Honorable Louis H. Pollak commenced on July 8, 1983 and ended on July 15, 1983 with the verdict of guilty on Count 1, conspiracy to distribute methamphetamine and Counts 32, 34 & 36, unlawful use of a communication facility.

4. On September 30, 1983 DiSalvo was sentenced to eleven (11) years imprisonment and four (4) years of probation to follow his release from prison.

5. The evidence against DiSalvo at trial consisted of three (3) intercepted telephone conversations between DiSalvo and Joseph Maleno (Maleno) on June 29th & 30th, 1982, the government's interpretation of the meaning of those conversations, several other intercepted telephone conversations between Maleno and other co-conspirators and DiSalvo's possession of a laboratory equipment catalog in August, 1982 which included the type of lab equipment that could be used to manufacture methamphetamine.

6. The three (3) intercepted telephone calls between DiSalvo and Maleno were innocuous on their face.

7. The first intercepted conversation took place at 2:26 p.m. on June 29, 1982 when Joseph Maleno called the DiSalvo. The following exchange took place:

MALENO: "You were right, it's extremely wet."

DiSALVO: "Okay."

MALENO: "All right, pal."

DiSALVO: "All right listen, when can I talk to you?"

MALENO: "Let me call you in the morning. I may call you tonight."

DiSALVO: "Yeah because I told you that other guy's coming in tomorrow morning too, then other two guys."

MALENO: "Uh huh."

8. At approximately 11:00 a.m. on June 30, 1982 Maleno called DiSalvo again and this dialogue took place:

MALENO: "Are you going to that other number?"

DiSALVO: "Yeah, that's what I was going to tell you but I ..."

MALENO: "The cars"

DiSALVO: "Yeah, I am going to see those other guys."

MALENO: "All right. All right. Could I say this? Can't we do this tomorrow? I ... I don't care."

DiSALVO: "Well, what's the difference?"

MALENO: "All right, well, because ... then I get pressed for time."

DiSALVO: "Well, here's what, don't get pressed for time."

MALENO: "Yeah, well, I, ... it's my own head."

DiSALVO: "There's two other guys coming in to, this afternoon, and I want, I want you to meet them guys."

9. At 2:09 PM on June 30, 1982 DiSalvo called Maleno:

DiSALVO: "I'm going to see those guys."

10. During the trial, D.E.A. Agent, Ellis Hershowitz, testified for the government as an expert witness with regard to the distribution of illegal drugs. Hershowitz said that in his opinion the words used by Joseph Maleno, "You were right, it's extremely wet", involved the quality of methamphetamine. Furthermore, he testified that in his opinion the Defendant's references to "two guys" in his conversations with Maleno meant two units of methamphetamine.

11. The court denied DiSalvo's motion for acquittal. His counsel produced the testimony of a F.B.I. agent and rested without calling DiSalvo to testify notwithstanding that DiSalvo asked Simone that he be called to testify.

12. Simone represented only DiSalvo during the pretrial stage, during the trial and at his sentencing.

13. Simone did not represent DelGiorno during the trial of this case. Simone did represent DelGiorno twice in connection with his appearance before grand juries. One such occasion was in 1985. On another occasion, subsequent to July 1983, Simone stated to security guards at a casino in Atlantic City that he represented DelGiorno and several other individuals, during a "fracas" which resulted in the arrest of Simone, as well as the others in the group.

14. Notwithstanding that Simone did not represent him in any other matters DelGiorno considered him to be his lawyer from 1980 until 1986.

## DISCUSSION

On January 28, 1987 DiSalvo filed this second of two Section 2255 motions. The Court's denial of the first motion was affirmed by the Court of Appeals on May 22, 1986. His second motion which was filed on January 28, 1986 was supplemented on February 9, 1988, amended on February 25, 1988 and supplemented again on May 5, 1988. The basis of his claim for relief in this petition is that he was denied his Sixth Amendment right to the effective assistance of counsel because:

(a) counsel failed to prepare for trial;

(b) counsel failed to subpoena John Maleno [1]; and

(c) counsel convinced him not to testify in order to protect DelGiorno who was one of his client.

He also claims that a pre-trial hearing should have been held on the issue of Simone's conflict of interest and that Simone rendered ineffective assistance of counsel because he himself was under government investigation.

In an affidavit filed with the court, the averments of which are consistent with his testimony at the evidentiary hearing, DiSalvo contends that:

If I had been given the chance to testify, I would have told the court that my contact with Joseph Maleno, including the intercepted conversations, included my attempt to introduce Joseph Maleno to Thomas DelGiorno so Maleno could borrow the necessary money to pay me. I knew that DelGiorno loaned money, since I had borrowed from him myself. I believed DelGiorno would loan money to Joseph Maleno if I vouched for him. The "two guys" mentioned in once (sic) of my intercepted conversations with Maleno were DelGiorno and another man unknown to me. I was trying to arrange a meeting between Maleno and DelGiorno. I had no other business with Joseph Maleno. Therefore, I could have testified truthfully and denied any involvement in Maleno's drug ring.

Affidavit, dtd. 5/27/88, 91; TR 33, 34, 35, 36, 37, 38.[2] Insofar as the laboratory equipment catalog is concerned, DiSalvo contends that if he had been permitted to testify, he would have explained to the court that he obtained the catalog from his brother who works for Betz Chemical Company as a favor for a friend at a racetrack. Id;, TR 18. According to DiSalvo, Simone, in not having him testify, was motivated by

---

1. John Maleno is Joseph Maleno's nephew.

2. TR refers to the transcript of the evidentiary hearing.

a desire to serve the interests of his client DelGiorno.

In order to establish a violation of the Sixth Amendment right to the effective assistance of counsel based on a claim of a conflict of interests, the defendant must establish that an *actual* conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). Prejudice is presumed if the defendant establishes that counsel actively represented conflicting interests, and his performance was adversely affected thereby. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *United States v. Gambino*, 788 F.2d 938 (3d Cir.1986).

The Third Circuit, on remand of *Sullivan supra,* has provided the following standard to be employed in determining whether an actual conflict of interests exists.

> Actual conflict of interest is evidenced if, during the course of the representation, the defendant's interests diverge with respect to a material factual or legal issue or to a course of action. This conflict must cause some lapse in representation contrary to the defendant's interest but such lapse need not rise to the level of actual prejudice.

*Cuyler v. Sullivan (Sullivan II)*, 723 F.2d 1077 (3d Cir.1983).

Although DelGiorno testified that he considered Simone to have been his lawyer during the years from 1980 to 1986, DiSalvo has not established that Simone actively represented the interests of DelGiorno which were in conflict with his own. Evidence of the three occasions when Simone represented DelGiorno before the grand juries and at the casino are, without more, insufficient to establish an on-going attorney-client relationship between them. Moreover, on at least one occasion DelGiorno was represented by a lawyer other than Simone in connection with the sale of a restaurant in 1982. In addition, DelGiorno

testified that he had a few gambling cases, following his grand jury appearances, when he was represented by lawyers other than Simone. Thus, DiSalvo has produced, at best, evidence of a mere possibility that if either he or DelGiorno or both had been called to testify about the proposed loan of money by DelGiorno to Maleno, he, i.e., Simone, would have breached his duty of loyalty to DelGiorno to protect him from a possible prosecution on loan shark charges. Accordingly, I conclude, contrary to DiSalvo's contention, that during his representation by Simone his interests did not diverge by reason of Simone's relationship with DelGiorno when he failed to call him and DelGiorno as witnesses. By the same reasoning, I conclude that DiSalvo's claims that Simone's conflict of interest caused him to fail to prepare for trial and to subpoena John Maleno are without merit.

DiSalvo's two final conflict of interest related claims are also without merit. He claims that a pre-trial hearing should have been held on the issue of Simone's alleged conflict of interest. DiSalvo's conflict of interest claim was not made until long after his trial. Moreover, unlike a case of multiple representation, which might have justified an inquiry by the court,[3] no such representation existed here and nothing in the record gave even a hint of a conflict of interest which would have warranted a pretrial hearing on this issue. Finally, he contends that Simone rendered ineffective assistance because he was under government investigation. At the evidentiary hearing, Simone acknowledged that he was the subject of an investigation by the government for over twenty years. Tr. 17. However, DiSalvo produced nothing to support his claim that Simone's representation was adversely affected by the government's investigation. The shallowness of this claim is exemplified by his testimony on the subject at the evidentiary hearing when examined by his attorney, Kirk Adams, Esquire.

> Q. Did Mr. Simone ever tell you, and again I'm referring to during the time he was representing you in 1983, did he ever

---

**3.** The Sixth Amendment does not, absent special circumstances, require a trial court to initiate inquiries into the propriety of multiple representation. *Cuyler v. Sullivan,* 446 U.S. at 345–348, 100 S.Ct. at 1716–1718, (1980).

tell you that he himself was the subject of a criminal investigation by the Internal Revenue Service.

A. I don't remember that. I really don't remember him ever telling me that. If he did, I don't—but—it was common knowledge that he had a lot of run-ins with the law, but I really, you know, I don't know that.

Tr. 41.

DiSalvo's second major contention in support of his motions is that he was convicted without the benefit of due process when he was denied an opportunity to testify in his own defense. In *United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 118–119 (3d Cir.1977) the court analyzed the rulings of federal as well as state courts on the question—does a criminal defendant have a constitutional right to testify in his own behalf? Recognizing that a right to testify is not specifically granted by the constitution, the court cited a number of cases, federal and state, that held that a criminal defendant has no right to testify in his own defense. However, the court cited recent federal and state cases holding to the contrary,[4] which led it to conclude, as did the trial judge, that considerable doubt existed as to the continued validity of cases which held that a constitutional right to testify did not exist.

The court cited, among other cases in which the right was recognized, *Poe v. United States*, 233 F.Supp. 173 (D.D.C. 1964), aff'd, 122 U.S.App.DC. 163, 352 F.2d 639 and quoted the following observations by Judge J. Skelly Wright speaking for the court.

> [T]he right to testify is a basic right, and there is an obligation on the part of both the Court and trial counsel to inform the accused of his right to testify, if he so desires. Further, it is the duty of both to assure that the exercise of this basic

right by the accused is a free and meaningful decision. He must make the ultimate decision on whether or not to take the stand. In this regard, it is unlike other decisions, which are often called 'trial decisions', where it is counsel who decides whether to cross-examine a particular document and it is the duty of counsel to present to him the relevant information on which he may make an intelligent decision. *Poe v. U.S., supra*, at 176.

*Wilcox v. Johnson, supra* at 118, 119. Then in affirming the trial judge's conclusion that a criminal defendant has a constitutional right to testify it said, "[i]t appears that the District Judge's pronouncement ... fairly reflects the recognition of such a right by the courts." *Id.* at 119. Thus, I conclude that DiSalvo had a constitutional right to testify at his trial, which right was abridged by his not being called to testify by Simone unless he made a free and meaningful decision not to testify.

DiSalvo maintains that when his Rule 29 motion for acquittal was dismissed, he and Simone had a conversation outside of the courtroom during a recess. In that conversation he claims that he told Simone that

> I've got to take the stand.... If I don't take the stand, the Judge is only to hear [D.E.A. Agent Hershowitz'] interpretation of what I was saying, and what I was saying, my words is what I meant. I didn't use no coded words, I said two guys, that meant two gentlemen. I think that's American language, you know, your Honor. [Simone] said something well, if the Judge thinks your lying, he's going to bury you. I says, "Bobby, I don't have to lie." I says "I can tell the truth." I said, "I can explain these conversations. These conversations were about a loan."

---

**4.** See also: *United States v. Butts,* 630 F.Supp. 1145 (D.Me.1986) which cites *Wilcox,* supra, and held that "a defendant's right to testify in a criminal proceeding against him [is] so basic to a fair trial that its infraction can never be treated as harmless error...." *Id.* at 1148. But see, *Bisaccia v. Attorney General of State of N.J.,* 623

F.2d 307, 313 (3d Cir.1980) which holds, "since the error in this case may be viewed as a violation of the appellant's Fourteenth Amendment due process right, this case must be remanded for a determination of whether it was harmless error."

Tr. 30. Further discussions about DelGiorno and Maleno ensued and DiSalvo then said,

> [W]e argued back and forth and we never came to a different thing.... We never made decision on whether I should take the stand or not....
>
> Then I said, "there was two books in the case, two catalogues." ... I wanted to explain about the books. And Mr. Simone for some other reason I didn't know at the time because I didn't know that much about the law, I'm a layman. I don't know about law. And we went back and forth and we stood out there for about a half an hour, so he said "We better get back inside." I said "Well, what are we going to do?" He said "We'll play it by ear."
>
> So we get inside ... And he called one witness to the stand, an FBI Agent ... And it never—before I knew it, the defense rested. And that was it, and the case was over as far as I was concerned. But I never, like I didn't know I could get up and say wait a minute, your Honor, I want to say something or whatever. I never got a chance to say that because I didn't know procedure at the time.

Tr. 30–33.

When testifying at the evidentiary hearing, Simone's memory was anything but sharp when questioned about his discussions with DiSalvo about his professed desire to testify. When examined by DiSalvo's lawyer, he gave the following testimony about the events following the court's denial of the motion for acquittal.

*By Simone:*

> [A]nd the Judge denied the motion from the bench ... And John—then it was a question of whether or not we were going to put on a defense, so John and I went to, I think we had a brief recess or the Court recessed and we went in the hall, and we had some conversation about what what defense, if any, to put on.
>
> * * * * * *

*Mr. Adams:*

> Q. Do you remember what Mr. DiSalvo said and what you said?

A. It's very difficult for me to remember. Not—as I said, I do remember with almost exactness what happened in the courtroom because I thought the—you know, I explained that already. There was a conversation that we had about what we were going on with and I think, you know, the weather report. I don't remember what if any other witnesses or evidence we put on, I really don't recall. I think I put an FBI Agent on the stand, Manley.

 * * * * * *

Q. Allow me to ask you a specific question. Mr. Simone, do you remember whether or not the defendant told you that he wanted to testify?

A. I can't remember. I won't say that he did and I won't say that he didn't. I really, I honestly can't remember.

 * * * * * *

A. John DiSalvo didn't say anything in my opinion that was incriminating on the telephone. That's my recollection.

Q. I understand what you're saying but my question to you is simply did he ever explain to you during the time you represented him, talking about Mr. DiSalvo, did he ever explain to you why he had called [Mr. Maleno], give you any explanation that could be considered important to the case or exculpatory evidence or anything like that?

A. Are you asking me about the possibility of his testifying to explain it.

Q. Yes.

A. I don't remember specifically why he didn't testify. I don't remember the conversation, but I know we discussed it, I discussed it with every client. But, he, I know he had a record; I don't remember if that was the reason or—I really just, its very difficult for me to remember why he didn't testify you know. Its his right, it's not my right.

Q. Okay. Did you explain that to him?

A. What, that he had a right to testify?

Q. Yes.

A. Well, he knew that. He wasn't—this wasn't the first case he was involved in in his life.

Q. Okay, maybe he did and maybe he didn't. My question is did you and do you now have a specific recollection of telling Mr. DiSalvo that the decision whether or not he testified was one that he could make and should make himself?

A. To be—I can't specifically remember telling him. I assume that I did, I wouldn't swear that I did. I just you know, I've had—I'd hate—I don't even know how many trials since then.

Q. Referring again to the conversation you had with Mr. DiSalvo in the hallway outside of the courtroom during the trial that we've already started to talk about, do you recall how that conversation was concluded? I mean, at some point you went back in the courtroom, I presume?

A. Back in the courtroom and I guess there was a decision made to put on the weather report and put Manley on. I mean, was there any other witnesses, I don't remember if there were any other witnesses. I mean, I'll accept what you say is on the record, I don't recall.

Q. Well, the record shows that there were no other witnesses called.

A. Then that's what the decision that was made.

Q. But my question is do you specifically recall a decision being made, a joint decision between yourself and Mr. DiSalvo with respect to his testimony or do you have a recollection of that?

A. I would assume it was a joint decision, but I have no specific recollection of John saying I'm not going to testify or I don't think I should testify. I don't have a recollection of me saying I

don't think you should testify. But John—we knew the case, we discussed the case before, at my office, at other places, and our concentration on the case was based on the lack of evidence and the cross-examination and the law....

Tr. 5, 6, 7, 8, 10, 11, 12.

The court is aware and concerned about the abuse of the system that would occur when a lawyer selectively discards from his memory details of trial proceedings in order to aid his client's request for a new trial on the basis that he was denied the right to testify. I impute no such wrong doing to Mr. Simone in this case. However, based on his limited recall of the events relevant to this issue and Mr. DiSalvo's unequivocal testimony, I conclude that Simone did not advise DiSalvo of his right to testify despite DiSalvo's having told him that he wanted to testify. Further, I conclude that Simone did not provide him with relevant information that would have enabled him to make a meaningful decision to testify or not to testify. Indeed, the evidence supports a conclusion that DiSalvo did not make the decision not to testify but that Simone made that decision in electing instead to "play it by ear" or by limiting the defense to an attack on the government's interpretation of the word "wet" allegedly used as a code word in the telephone conversation between DiSalvo and Maleno by introducing a weather report and by attempting to show an unlawful prosecution motive by the testimony of the FBI Agent[5].

In its opinion dated July 18, 1983 and at sentencing the court stated that it concluded that the "innocuous-sounding conversations" between DiSalvo and Maleno were inculpatory beyond a reasonable doubt in reliance, in part, upon the interpretation of the words used by DiSalvo. Opinion, at App. 1–2; sentencing transcript at 30. Hence, DiSalvo was convicted, in part, on the opinion of Hershowitz that the words meant something other than what on their

---

**5.** Simone testified that ... "I had some information that he had made some comments about DiSalvo or me, that he was out to get like certain, certain Italians or something like that." Tr. 7, 8.

face they meant. If the court were to have heard DiSalvo say, from the witness stand, what he meant by the words that he uttered, his testimony, if believed, would have been clearly more authoritative and worthy of much greater weight than Hershowitz' opinion. In addition, his explanation of the presence of the catalogue in the trunk of the car, if believed, would have created further doubt that he was guilty. I conclude, therefore, that DiSalvo was not accorded due process by being denied the right to testify and that this was not harmless beyond a reasonable doubt.

## CONCLUSIONS OF LAW

1. During his representation of DiSalvo, Simone did not have an actual conflict of interest which denied him his Sixth Amendment right to effective assistance of counsel.

2. DiSalvo was denied his due process right to testify in his own defense.

## RECOMMENDATION

AND NOW, this 12th day of May, 1989, it is RECOMMENDED that John DiSalvo's motion and supplemental motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 be DENIED insofar as it claims a denial of his Sixth Amendment right to the effective assistance of counsel and GRANTED insofar as he claims that he was denied his right to testify in his own defense. It is further recommended that he be granted a new trial.

## APPENDIX B

## MEMORANDUM

July 11, 1989.

## LOUIS H. POLLAK, District Judge.

In 1983, John DiSalvo was indicted for various drug offenses relating to the alleged distribution of methamphetamine. At a bench trial, Mr. DiSalvo was found guilty on July 18, 1983 of conspiracy to distribute methamphetamine and three counts of unlawful use of a communications facility. On September 30, 1983, Mr. DiSalvo was sentenced to eleven years of incarceration to be followed by a probationary term of four years. Mr. DiSalvo's conviction was upheld by the Court of Appeals for the Third Circuit in November of 1984. In March of 1985, Mr. DiSalvo's motion for reduction of sentence and a collateral challenge of the conviction pursuant to 28 U.S.C. § 2255 were both denied. In May of 1986, the Court of Appeals affirmed the denial of the section 2255 motion. Early in 1987, shortly before Mr. DiSalvo was scheduled to surrender to commence his term of incarceration, he filed a second section 2255 motion. This motion was referred to Magistrate Hall in March of 1987. The scope of the section 2255 motion was expanded by subsequent supplemental pleadings. On September 8, 1988, Magistrate Hall held an evidentiary hearing. On May 15, 1989, Magistrate Hall filed a Report and Recommendation rejecting one of Mr. DiSalvo's principal contentions but sustaining another. The rejected contention was that Mr. DiSalvo's retained trial attorney, Robert Simone, had a conflict of interest in that he was contemporaneously representing Thomas DelGiorno and that Mr. Simone therefore refused to adduce testimony to show that an allegedly inculpatory telephone conversation between Mr. DiSalvo and Joseph Merlino actually related not to an anticipated receipt by Mr. DiSalvo of methamphetamine but to an anticipated conversation with Mr. DelGiorno and an associate arranging a loan from Mr. DelGiorno to Mr. Merlino. The contention which Magistrate Hall sustained was Mr. DiSalvo's claim that he wished to testify at trial in his own behalf but that Mr. Simone, although apprised of this by Mr. DiSalvo, did not call Mr. DiSalvo to the witness stand.

Both the defense and the government have filed objections to Magistrate Hall's Report and Recommendation.

In assessing the defendant's and the government's respective objections, I have reviewed the Report and Recommendation and I have reviewed the transcript of the hearing conducted by Magistrate Hall on September 8, 1988.

*Defendant's Objections to Magistrate Hall's Report and Recommendation*

Mr. DiSalvo objects to Magistrate Hall's Findings of Fact Nos. 12 and 13. These Findings of Fact are as follows:

12. Simone represented only DiSalvo during the pretrial stage, during the trial and at his sentencing.

13. Simone did not represent DelGiorno during the trial of this case. Simone did represent DelGiorno twice in connection with his appearance before grand juries. One such occasion was in 1985. On another occasion, subsequent to July 1983, Simone stated to security guards at a casino in Atlantic City that he represented DelGiorno and several other individuals, during a "fracas" which resulted in the arrest of Simone, as well as the others in the group.

On page 601 of his Report and Recommendation Magistrate Hall explains in detail the assessment of the testimony which underlies the challenged factual findings:

Although DelGiorno testified that he considered Simone to have been his lawyer during the years from 1980 to 1986, DiSalvo has not established that Simone actively represented the interests of DelGiorno which were in conflict with his own. Evidence of the three occasions when Simone represented DelGiorno before the grand juries and at the casino are, without more, insufficient to establish an on-going attorney-client relationship between them. Moreover, on at least one occasion DelGiorno was represented by a lawyer other than Simone in connection with the sale of a restaurant in 1982. In addition, DelGiorno testified that he had a few gambling cases, following his grand jury appearances, when he was represented by lawyers other than Simone. Thus, DiSalvo had produced, at best, evidence of a mere possibility that if either he or DelGiorno or both had been called to testify about the proposed

loan of money by DelGiorno to Maleno, he, i.e., Simone, would have breached his duty of loyalty to DelGiorno to protect him from a possible prosecution on loan shark charges. Accordingly, I conclude, contrary to DiSalvo's contention, that during his representation by Simone his interests did not diverge by reason of Simone's relationship with DelGiorno when he failed to call him and DelGiorno as witnesses. By the same reasoning, I conclude that DiSalvo's claims that Simone's conflict of interest caused him to fail to prepare for trial and to subpoena John Maleno are without merit.

My reading of the transcript fully sustains the assessment made by Magistrate Hall who, of course, heard and saw the witnesses.

Accordingly, I reject defendant's challenge to factual findings 12 and 13.

*Government's Objections to Magistrate Hall's Report and Recommendation*

The government objects to Magistrate Hall's Finding of Fact No. 11. That finding is as follows:

11. The court denied DiSalvo's motion for acquittal. His counsel produced the testimony of a F.B.I. agent and rested without calling DiSalvo to testify notwithstanding that DiSalvo asked Simone that he be called to testify.

The portion of the factual finding which the government contests is the finding that Mr. Simone "rested without calling DiSalvo to testify notwithstanding that DiSalvo asked Simone that he be called to testify."

The government's chief contention is that Mr. DiSalvo's testimony that he wanted to testify at the trial but that his expressed wish was frustrated by his trial counsel's actions is simply not credible. My review of the transcript gives me no reason to conclude that Magistrate Hall, who had the opportunity to assess the credibility of the witnesses at first hand, was not warranted in making the challenged factual finding.[1]

---

1. The government insists that Mr. DiSalvo's claim is especially suspect because it was not advanced until Mr. DiSalvo's *second* section 2255 motion; it may be confidently assumed

that Magistrate Hall's credibility determination took that fact into account.

In reliance on *Louis v. Blackburn,* 630 F.2d 1105, 1108–1110 (5th Cir.1980); *United States v.*

The government also contends that, assuming Mr. DiSalvo was precluded from testifying in his own behalf, the error was harmless beyond a reasonable doubt. Given that what Mr. DiSalvo chiefly wanted to testify about was to show that allegedly inculpatory telephone conversations which were the principal evidence against Mr. DiSalvo were in fact innocent, it cannot be said by this fact-finder that there is no significant possibility that Mr. DiSalvo's testimony would have made a difference.

### Conclusion

Accordingly, in an accompanying Order, Magistrate Hall's Report and Recommendation is approved.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby ORDERED that the Report and Recommendation of Magistrate William F. Hall is APPROVED and defendant DiSalvo is granted a new trial.

*Hrdlicka,* 520 F.Supp. 403 (W.D.Wis.1981), the government has requested "a de novo evidentiary hearing." Government's Objections to Magistrate's Report and Recommendation, footnote 2 at pages 8–9. As the cited cases, which build on *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) establish, it would be procedurally inappropriate for a district judge to *reject* a magistrate's credibility determinations without conducting a further evidentiary hearing; but where, as here, a district judge finds a magistrate's evaluation of the testimony taken before the magistrate to be sound, a further evidentiary hearing is superfluous.