April 7, 1993
 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

No. 92-2087

 CHARLES D. LEMA,

 Petitioner, Appellant,

 v.

 UNITED STATES OF AMERICA,

 Respondent, Appellee.

 

 ERRATA SHEET

 The opinion of this Court issued March 3, 1993, is amended as
follows:

 Page 9, line 11 of text, should read: DiSalvo, 726 F. Supp. 596,
 
598 . . . 

March 3, 1993 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-2087

 CHARLES D. LEMA,

 Petitioner, Appellant,

 v.

 UNITED STATES OF AMERICA,

 Respondent, Appellee.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Hector M. Laffitte,* U.S. District Judge]
 

 

 Before

 Torruella and Cyr, Circuit Judges,
 

 and Bownes, Senior Circuit Judge.
 

 

 Christopher W. Dilworth for appellant.
 
 F. Mark Terison, Assistant United States Attorney, with whom
 
Richard S. Cohen, United States Attorney, was on brief for appellee.
 

 

 

*Of the District of Puerto Rico, sitting by designation.

 March 3, 1993
 

 CYR, Circuit Judge. Charles Donald Lema, convicted of various
 CYR, Circuit Judge.
 

drug charges, appeals the dismissal of his petition for postconviction

relief under 28 U.S.C. 2255. Lema asserts that his attorney was

ineffective, his trial was tainted by prosecutorial misconduct, and

his sentencing proceeding was infected by factual error. We affirm.

 I

 BACKGROUND
 

 In 1989, following a federal undercover operation, Lema was

indicted on two counts of conspiring with Raymond Souza to distribute

cocaine to Alex Hood, a DEA informant, and on two related counts of

aiding and abetting Souza's cocaine distributions. The first brace of

counts charged that on December 15, 1988, Lema aided and abetted Souza

in the sale of one kilogram of cocaine to Hood [the "December transac-

tion"]. The second brace of counts charged that on January 25, 1989,

Lema, Souza, and a third man, Alberto Monsalve-Zapata, sold three

kilograms of cocaine to Hood and another undercover agent, Michael

Bansmer, as part of a ten-kilogram transaction negotiated by Souza

[the "January transaction"]. The government does not dispute that

Souza took the most active role in arranging and consummating these

transactions; however, it suggests that Lema's culpability was reason-

ably inferable from his presence, with Souza, throughout both transac-

tions, and from certain telltale statements made in the presence of

undercover officers, indicating Lema's knowing participation in the

distribution scheme.2

 Lema pleaded not guilty to all charges. Prior to trial, he dis-

charged his court-appointed counsel and retained David Pomeroy,

Esquire. Lema met with Pomeroy several times, and emphatically

expressed his desire to testify at trial.3 In furtherance of Lema's

stated desire to testify, Pomeroy filed a motion in limine to preclude

cross-examination about Lema's prior criminal conviction for inter-

state transportation of stolen property. The motion was denied on

August 7, 1991.

 Trial began the next day. At trial, the defense contended that

though Lema may have been at the scene of the drug transactions, he

neither actively participated in, nor was he aware of, Souza's cocaine

dealings on those occasions. The government's case was based largely

on the testimony of Hood and Bansmer, who testified to Lema's presence

at the scene of the drug exchanges. The purport of their testimony

was that it would have been virtually impossible for Lema not to have

known that Souza was conducting drug transactions on those occasions.

At the close of the government's case, Lema conferred with Pomeroy and

 

2For a fuller description of Lema's involvement in these transactions,
and his subsequent trial, see United States v. Lema, 909 F.2d 561 (1st
 
Cir. 1990).

3Lema also recommended that Pomeroy call three witnesses to corrobo-
rate his story: Souza, Ann Marie Burke, and Patricia Lyons. See
 
infra at pp. 12-17. 
 

 3

again expressed his desire to testify. Pomeroy no less emphatically

advised Lema that the government's case was weak and that in light

of the denial of the motion in limine Lema's testimony would expose

him to cross-examination concerning his prior conviction, would lose

the sympathy of the jury, and therefore would be unwise. An argument

ensued, witnessed by courtroom observers; Lema did not testify.

Pomeroy then recalled one witness, a DEA agent who had attempted to

record the December drug transaction but failed to capture Lema's

voice on tape. The defense rested.

 At closing argument, the prosecutor acknowledged that Lema said

little during the course of the two drug transactions, but urged the

jury to infer Lema's knowledge of Souza's drug dealings, and Lema's

intent to participate in the drug distribution scheme, from the fact

that Lema had been present and remained silent during both transac-

tions. Lema was convicted on all counts.

 Thereafter, Lema, acting pro se, moved for a new trial, accusing
 

Pomeroy of ineffective assistance. At Lema's request, Pomeroy with-

drew, and successor counsel was appointed to represent Lema at sen-

tencing. The district court dismissed Lema's motion for new trial as

untimely. The court sentenced Lema to 135 months in prison. We

affirmed Lema's conviction on direct appeal. See note 1 supra.
 

 Undaunted, Lema moved for vacation of sentence and new trial

under 28 U.S.C. 2255. The district court summarily denied four of

Lema's habeas claims but reserved judgment on the fifth, which alleged

that Pomeroy prevented him from testifying. After an evidentiary

 4

hearing, a magistrate-judge recommended denial of the ineffective

assistance claim. The district court thereupon denied the section

2255 petition in its entirety.

 II

 DISCUSSION
 

 This appeal has two parts: a formal appeal, filed by appellate

counsel, asserting ineffective assistance by trial counsel; and a

supplemental pro se brief, raising claims of prosecutorial misconduct
 

and sentencing error. We address each in turn.

A. Ineffective Assistance of Counsel.
 

 The Sixth Amendment guarantees criminal defendants the right to

effective assistance of counsel. Strickland v. Washington, 466 U.S.
 

668, 687 (1984). But "[t]he Constitution does not guarantee a defen-

dant a letter-perfect defense or a successful defense; rather, the

performance standard is that of reasonably effective assistance under

the circumstances then obtaining." United States v. Natanel, 938 F.2d
 

302, 309-10 (1st Cir. 1991) (citation omitted), cert. denied, 112 S.
 

Ct. 986 (1992). A petitioner bears a very heavy burden on an ineffec-

tive assistance claim. The habeas court must "evaluate the [chal-

lenged] conduct from counsel's perspective at the time," Strickland,
 

466 U.S. at 689, considering "the totality of the circumstances before

it," Perron v. Perrin, 742 F.2d 669, 673 (1st Cir. 1984), and making
 

"every effort . . . to eliminate the distorting effects of hindsight,"

 5

Strickland, 466 U.S. at 689. It "must indulge a strong presumption
 

that counsel's conduct falls within a wide range of reasonable profes-

sional assistance; that is, the defendant must overcome the presump-

tion that, under the circumstances, the challenged action 'might be

considered sound trial strategy.'" Id. (citation omitted). Moreover,
 

the court must not only find that defense counsel's performance was

deficient, but that it was so prejudicial as to undermine confidence

in the outcome of the trial, see id. at 693-94, and the fundamental
 

fairness of the result. Lockhart v. Fretwell, 61 U.S.L.W. 4155 (Jan.
 

25, 1993).

 The burden is on the petitioner to demonstrate ineffective

assistance by a preponderance of the evidence. See Myatt v. United
 

States, 875 F.2d 8, 11 (1st Cir. 1989); United States v. DiCarlo, 575
 

F.2d 952, 954 (1st Cir.), cert. denied, 439 U.S. 834 (1978). Where a
 

petition "(1) is inadequate on its face, or (2) although facially

adequate, is conclusively refuted as to the alleged facts by the files

and records of the case," DiCarlo, 575 F.2d at 954, summary dismissal
 

is appropriate. Moreover, "even a section 2255 petition predicated on

specific assertions of fact allegedly supported in the record may be

dismissed summarily by the district court," Barrett v. United States,
 

965 F.2d 1184, 1186 (1st Cir. 1992), provided "the district court can

. . . 'test' the . . . allegations by assuming arguendo their truth,
 

and then assessing their sufficiency in light of the relevant consti-

tutional standards and the record." Id., quoting Moran v. Hogan, 494
 

 6

F.2d 1220, 1222 (1st Cir. 1974); see also United States v. Butt, 731
 

F.2d 75, 77 (1st Cir. 1984).

 1 .

 The Alleged Prevention of Lema's Testimony.
 

 Pomeroy prevailed in the argument over whether it would be

advisable for Lema to testify. Lema now claims that Pomeroy's advice

in effect prevented Lema from testifying, and amounted to ineffective
 

assistance of counsel, see United States v. Teague, 953 F.2d 1525,
 

1532, 1534 (11th Cir.) (en banc), cert. denied, 113 S. Ct. 127 (1992).
 

The government responds that Lema knowingly and voluntarily accepted

Pomeroy's advice, and must, in effect, live with the consequences.

 a.The Right to Testify.
 

 We assume, without deciding, that the constitutional right to

testify in one's defense is "fundamental," and, as such, may not be

waived by counsel on the defendant's behalf, regardless of the sound-

ness of any strategic or tactical considerations.4 It is unnecessary

 

4The right to testify in one's defense has been recognized as "funda-
mental" by the Supreme Court in dictum on several occasions. See Rock
 
v. Arkansas, 483 U.S. 44, 53 n.10 (1987) ("[o]n numerous occasions the
 
Court has proceeded on the premise that the right to testify on one's
own behalf in defense to a criminal charge is a fundamental constitu-
tional right"); id. at 52 (finding right "[e]ven more fundamental to a
 
personal defense than the right of self-representation"); see also
 
Jones v. Barnes, 463 U.S. 745, 751 (1983) ("the accused has the
 
ultimate authority to make certain fundamental decisions regarding the
case, as to whether to plead guilty, waive a jury, testify in his or
her own behalf, or take an appeal"); Wainwright v. Sykes, 433 U.S. 72,
 
93 n.1 (1977) (Burger, C.J., concurring) ("[o]nly such basic decisions
as whether to plead guilty, waive a jury, or testify in one's own
behalf are ultimately for the accused to make"); cf. Nix v. Whiteside,
 

 7

to address the underlying issue, as we conclude that Lema, on advice

of counsel, knowingly and voluntarily, if reluctantly, refrained from

testifying in his own defense.

 Unaccompanied by coercion, legal advice concerning exercise of

the right to testify infringes no right, see Teague, 953 F.2d at 1534-
 

35; Rogers-Bey, 896 F.2d at 283, but simply discharges defense coun-
 

sel's ethical responsibility to the accused. See ABA Standards
 

Relating to the Administration of Criminal Justice, Compilation p. 127

(1974) ("the decisions which are to be made by the accused after full

consultation with counsel are . . . (iii) whether to testify in his

own behalf."). The difficult line courts must draw between earnest

counseling and overt coercion is guided by several considerations,

including: (1) whether the defendant knew about his constitutional

right to testify, and if not, whether he was informed by counsel, see
 

 

475 U.S. 157, 164 (1986) ("[a]lthough this Court has never explicitly
held that a criminal defendant has a due process right to testify in
his own behalf . . . the right has long been assumed"). Virtually all
circuits which have considered the issue since 1987 have reached the
same conclusion. See, e.g., Teague, 953 F.2d at 1531-32; United
 
States v. McMeans, 927 F.2d 162 (4th Cir. 1991); Rogers-Bey v. Lane,
 
896 F.2d 279 (7th Cir. 1990), cert. denied, 111 S. Ct. 93 (1990);
 
United States v. Martinez, 883 F.2d 750, 754 (9th Cir. 1989); vacated
 
on other grounds, 928 F.2d 1470 (9th Cir. 1991); United States v.
 
Bernloehr, 833 F.2d 749 (8th Cir. 1987); United States v. Curtis, 742
 
F.2d 1070, 1076 (7th Cir. 1984), cert. denied, 475 U.S. 1064 (1986);
 
United States v. Bifield, 702 F.2d 342 (2d Cir.), cert. denied, 461
 
U.S. 931 (1983); see generally Marjorie Rifkin, The Criminal Defen-
 
dant's Right to Testify: The Right to Be Seen but not Heard, 21
 
Colum. Human Rts. L. Rev. 253 (1989). Although this court has never
formally considered the issue, Judge Reinhardt, sitting by designa-
tion, described the testimonial right as "fundamental" in a concurring
opinion in United States v. Nivica, 887 F.2d 1110, 1128 (1st Cir.
 
1989), cert. denied, 494 U.S. 1005 (1990).
 

 8

Teague, 953 F.2d at 1533 ("defense counsel bears the primary responsi-
 

bility for advising the defendant of his right to testify or not to

testify"); see also Bernloehr, 833 F.2d at 751 ("the defendant's
 

waiver of his right to testify, like his waiver of other constitu-

tional rights, must be made voluntarily and knowingly"); (2) the

competence and soundness of defense counsel's tactical advice, i.e.,
 

whether counsel presents the defendant with sufficient information to

permit a "meaningful" voluntary waiver of the right to testify, see
 

United States v. Poe, 352 F.2d 639, 640-41 (D.C. Cir. 1965) (finding
 

deprivation of fair trial where counsel misinformed defendant of

consequences of taking the stand); United States v. DiSalvo, 726 F.
 

Supp. 596, 598 (E.D. Pa. 1989) (holding that defendant had not waived

testimonial right where counsel failed to ensure defendant's knowledge

of his right to testify, or otherwise to provide relevant information

that would enable a meaningful decision); and (3) any intimidation or

threatened retaliation by counsel relating to the defendant's testimo-

nial decision. See, e.g., Nichols v. Butler, 953 F.2d 1550, 1553
 

(11th Cir. 1992) (finding coercion where counsel, in effort to coerce

defendant to waive testimonial right, threatened to withdraw during

trial). With these considerations in mind, we inquire whether Pome-

roy's vigorous expression of views during their argument coerced Lema

into waiving the right to testify.

 b .
 The Evidence of Coercion.
 

 9

 The district court concluded that Lema, notwithstanding some

initial resistance, knowingly and voluntarily acceded to Pomeroy's

advice and waived his right to testify, consistent with the articulat-

ed trial strategy. The court found no evidence that Pomeroy had

attempted to coerce Lema's testimonial decision, nor that he had

overborne Lema's will. We review these district court findings for

"clear error." See Ouimette v. Moran, 942 F.2d 1, 5 (1st Cir. 1991)
 

(clear error review of "mixed questions" in habeas corpus context).

 At the evidentiary hearing, Lema conceded that he had argued

vigorously, but that he ultimately "agreed" with Pomeroy that it would

be unwise to testify:

 Q :
 But . . . you agreed with Pomeroy not to testify.

 A :
 Yes, I agreed after on his advice.

 Q :
 And you agreed after weighing these facts that I've just gone
 over with you, facts that Pomeroy could deliver a dynamite clos-
 ing argument, right? . . . . And that played and weighed in
 your decision not to testify?

 A :
 Yes, that played a role in it, yes.

 Q :
 And another thing that played a role was that Pomeroy was an
 experienced criminal lawyer who knew what he was doing, right?

 A: Yes.

We think Lema's admitted agreement with Pomeroy's advice, albeit

reluctant, provided sufficient support for the district court finding

that Lema was not "coerced." Other evidence corroborates the district

 10

court finding. For example, in an August 16, 1989 letter to Lema,

Pomeroy recalls, among other things, that Lema "elected not to testi-
 

fy," after considering the effect of the district court's denial of

the motion in limine. More generally, Lema was neither a newcomer to

the American justice system nor unaware that he had the right to

testify in his own defense. Indeed, the apparent vehemence with which

Lema at first insisted on testifying, as evidenced by his argument

with Pomeroy, fairly may have reflected Lema's clear awareness that

the ultimate decision was his to make. The district court supportably

found that Lema was not coerced into waiving the right to testify.5

 2.The Failure to Call Proposed Defense Witnesses.
 

 Lema asserts, as a second basis for the "ineffective assistance"

claim, that Pomeroy neither interviewed, nor presented, three poten-

tial defense witnesses proposed by Lema, thereby depriving him of a

"viable defense," see United States v. Porter, 924 F.2d 395, 397 (1st
 

 

5As the factual underpinnings for Lema's ineffective assistance claim
are inadequate, we need not consider whether denial of a defendant's
right to testify is ever subject to "harmless-error" analysis.
Compare, e.g., Ortega v. O'Leary, 843 F.2d 258, 262 (7th Cir.), cert.
 
denied, 488 U.S. 841 (1988) (applying harmless-error analysis to
 
denial of defendant's right to testify); with, e.g., Martinez v. Ylst,
 
951 F.2d 1153, 1157 (9th Cir. 1991) ("[a]s a general matter, it is
only the most extraordinary of trials in which a denial of the defen-
dant's right to testify can be said to be harmless beyond a reasonable
doubt"); United States v. Butts, 630 F. Supp. 1145, 1148 (D. Me. 1986)
 
("a defendant's right to testify in a criminal proceeding against him
[is] so basic to a fair trial that its infraction can never be treated
as a harmless error"); Wright v. Estelle, 572 F.2d 1071, 1084 (5th
 
Cir.) (Godbold, J., dissenting) (rejecting harmless-error analysis in
context of testimonial right), cert. denied, 439 U.S. 1004 (1978). 
 

 11

Cir. 1991).6 Lema argues that these witnesses could have provided

evidence tending to show that he was unaware of Souza's purpose when

he agreed to drive north with Souza on the two trips that culminated

in the monitored drug transactions. The district court summarily

dismissed the claim, apparently on the ground that Lema's section 2255

motion failed conclusively to "overcome the presumption that . . . the

challenged action 'might be considered sound trial strategy.'"

Strickland, 466 U.S. at 689. We agree.
 

 The decision whether to call a particular witness is almost

always strategic, requiring a balancing of the benefits and risks of

the anticipated testimony. The witness may not testify as anticipat-

ed, see Porter, 924 F.2d at 397, or the witness's demeanor or charac-
 

ter may impress the jury unfavorably and taint the jury's perceptions

of the accused; or the testimony, though sympathetic, may prompt

jurors to draw inferences unfavorable to the accused, see, e.g.,
 

United States v. Tajeddini, 945 F.2d 458, 466 (1st Cir. 1991) ("to
 

call as a witness a person other than Parvin to testify to Parvin's

 

6The government argues that Lema's petition was conclusory in this
regard, i.e., that it failed to name the three putative witnesses.
 
See United States v. Michaud, 925 F.2d 37, 39 (1st Cir. 1991) (on
 
motion for post-judgment relief, "'conclusory allegations unsupported
by specifics are insufficient to require a court to grant an eviden-
tiary hearing'") (quoting Hopkinson v. Shillinger, 866 F.2d 1185, 1210
 
(10th Cir. 1989)). We do not agree. Lema's affidavit, attached to
and referenced in the section 2255 motion, made clear the identities
 
of the witnesses and the nature of their anticipated testimony. Given
Lema's pro se status, the reference by attachment, though perhaps
 
technically deficient, was sufficient to alert the court and the
government to the specific basis of Lema's claim. Cf. Haines v.
 
Kerner, 404 U.S. 519, 520-21 (1972) (holding pro se complaints "to
 
less stringent standards than pleadings drafted by lawyers").

 12

health might emphasize Parvin's absence and suggest that Parvin's

testimony would have been adverse to petitioner"), cert. denied, 112
 

S. Ct. 3009 (1992). Where the prosecution's case is less than compel-

ling, as Pomeroy represented to Lema during trial, the risk of "rock-

ing the boat" may warrant a decision by trial counsel to forego the

presentation of further defense testimony, even favorable testimony.

Johnson v. Lockhart, 921 F.2d 796, 800 (8th Cir. 1990) ("since the
 

government has the burden of proving guilt beyond a reasonable doubt,

it may not be necessary for the defense to introduce evidence to meet

the constitutional requirement of effective representation"); cf.
 

Natanel, 938 F.2d at 310 ("additional arguments could only impair [a]
 

client's seemingly secure position . . . . In litigation, as in life,

there is much to be said for such maxims as 'if it ain't broke, don't

fix it,' and 'quit when you're ahead'").

 There is little reason to believe that Pomeroy's failure to

present the three witnesses proposed by Lema was anything other than a

tactical decision. The government's case was relatively weak, based

largely on the testimony of two witnesses, one a paid informant.

Reasonably competent trial counsel might well have determined that the

best prospect for acquittal lay in discrediting the government's

witnesses, rather than presenting additional testimony which could

appear to legitimate the government's case or raise questions about

the defense not previously suggested by the government's evidence.

Furthermore, the availability of the putative testimony was problemat-

 13

ic at best.7 Finally, Pomeroy was well aware of the risks in calling

Souza, even assuming he was available to testify: Lema himself

mentioned to Pomeroy that, just prior to starting out with Souza on

the January drug transaction, Lema had said to Souza "I don't want to

be involved." Had Souza testified to this admission, it clearly would

have invited the reasonable inference that Lema knew in advance of the

illegal purpose of the January transaction.8

 

7Lema presented no affidavit from Souza, and no credible evidence,
that Souza's testimony would have been available. At the time of
Lema's trial, Souza was awaiting sentencing; he therefore retained a
valid Fifth Amendment right against self-incrimination. United States
 
v. Lugg, 892 F.2d 101, 102-03 (D.C. Cir. 1989); cf. United States v.
 
Zirpolo, 704 F.2d 23, 26 (1st Cir.) (co-defendant retained Fifth
 
Amendment right where prosecutor had agreed to recommend dismissal,
but charges had not yet been formally dismissed), cert. denied, 464
 
U.S. 822 (1983). Given the pendency of sentencing proceedings, we
will not assume that Souza would have waived his Fifth Amendment
privilege, particularly in support of Lema's version of the events 
which would have exposed Souza as the only culpable participant and
the person who had recruited an unsuspecting Lema. Cf. Brien v.
 
United States, 695 F.2d 10, 16 (1st Cir. 1982) ("given the fact that
 
[the codefendant] was then awaiting his own trial, it is highly
doubtful that he would have agreed to testify in any event").

8Another proposed witness, Burke, supposedly was willing to testify
that Souza had told her that Lema did not know about the drug deals,
and had gone along only "for the ride." It is highly doubtful that
Burke's hearsay testimony would have been admissible for any purpose,
see Fed. R. Evid. 801, absent the testimony of Souza, whose "avail-
 
ability" was entirely conjectural. See supra note 6. 
 
 The testimony of the third individual, Lyons, was tenuous and
collateral, and would not have absolved Lema. Lema contends that
Lyons would have testified that she declined an invitation to accompa-
ny Souza to Maine just before the January transaction. We are unable
to discern any relevance in this testimony. However, if it were
admissible, and the jury were to infer that Lyons had refused because
she knew in advance of Souza's illegal purpose, the testimony might
have tended to undercut Lema's claim of ignorance as well.

 14

 Lema argues that these strategic considerations are entitled to

little or no deference, since Pomeroy not only neglected to call these

witnesses but failed to investigate their potential testimony. See
 

Barrett, 965 F.2d at 1193 (citing Strickland, 466 U.S. at 690) (-
 

"'strategic choices made after thorough investigation of law and facts
 

relevant to plausible options are virtually unchallengeable'") (empha-

sis added); McCoy v. Newsome, 953 F.2d 1252, 1263 (11th Cir.) (-
 

"[f]ailure to investigate evidence that would be helpful to the

defense is an indication of ineffective assistance"), cert. denied,
 

112 S. Ct. 2283 (1992).

 The decision to interview potential witnesses, like the decision
 

to present their testimony, must be evaluated in light of whatever

trial strategy reasonably competent counsel devised in the context of

the particular case. See Wilkins v. Iowa, 957 F.2d 537, 540 (8th Cir.
 

1992) ("[a] less than exhaustive investigation is adequate for consti-

tutional purposes . . . if reasonable professional judgments justified

limiting its scope"). In view of the obvious tactical risks and

limited benefits discussed above benefits and risks which would

have been readily apparent to experienced trial counsel without

conducting an interview or further investigation we think that

Pomeroy's failure to interview the three proposed witnesses did not

amount to ineffective assistance in the constitutional sense. "Coun-

sel need not chase wild factual geese when it appears, in light of

informed professional judgment, that a defense is implausible or
 

insubstantial as a matter of law, or, as here, as a matter of fact and

 15

of the realities of proof, procedure, and trial tactics," Cepulonis v.
 

Ponte, 699 F.2d 573, 575 (1st Cir. 1983) (emphasis added).
 

 16

 3 .

 The Tape Recordings.
 

 The extent of Lema's participation in the actual drug exchanges

was a major issue at trial. A government agent (Bansmer) testified

that Lema said nothing during the second (January) drug exchange: but

Hood, the informant, testified that Lema said to Souza, "let's do the

deal and get going," perhaps implying knowledge of the purpose of

Souza's trip. Lema now asserts that Pomeroy should have used the

government's tape recordings of the incident (which did not pick up

Lema's voice) to impeach Hood's testimony. Indeed, Lema charges,

Pomeroy did not even attempt to obtain the tapes to learn what was on

them.

 The district court found that Pomeroy's cross-examination of Hood

showed that Pomeroy was aware of the contents of the tapes, and that

the decision not to play the tapes at trial was a matter of "trial

strategy":

 The record reveals that Lema's defense counsel engaged in
 extensive cross-examination about the existence of tapes of
 the . . . transactions and attempted to establish "that there
 were no recordings that backed up the testimony of the gov-
 ernment's witnesses." Lema, 909 F.2d at 567. Additionally,
 
 it can be reasonably inferred from the form of the question-
 ing that Lema's attorney had informed himself of the contents
 of those tapes and decided not to use them at trial since
 they were neither exculpatory nor clear. Id. Such tactical
 
 decisions are "deemed to be effective assistance."

Opinion at 4 (citing United States v. Tabares, 951 F.2d 405, 409 (1st
 

Cir. 1991)). The factual finding that Pomeroy had access to the tapes

 17

was not clearly erroneous, and our own reading of Pomeroy's cross-

examination of Hood accords with the district court's understanding.9

 While these trial tactics may appear dubious to the petitioner in

hindsight, especially in the grim reflection of the intervening

convictions, the reviewing court must be persuaded that the failed

trial strategy was not within the "wide range of reasonable profes-

sional assistance" contemplated by Strickland. We are not persuaded
 

that the failure to introduce the tapes was beyond Strickland's pale.
 

 4.Other Claims.
 

 The two remaining claims emphasized in Lema's supplemental pro se
 

brief are without merit. First, Lema alleges that the prosecutor's

closing argument included an indirect comment on Lema's failure to

testify. Although Lema states a cognizable claim under Griffin v.
 

California, 380 U.S. 609, 614 (1965) (prosecutor's comment on defen-
 

dant's failure to testify violates Fifth Amendment), our review

convinces us that the claim is unsubstantiated. The transcript

reveals that the prosecutor's comments were not addressed to Lema's

 

9Lema asserts that Pomeroy was "surprised" at trial when Hood (the
government's first witness) stated that he had worn a recording device
during the January transaction. Fairly read, however, we believe the
transcript is ambiguous: it appears that Pomeroy either misunder-
stood, or failed to recall, Hood's earlier testimony that he had not
worn a recorder during a different meeting with Souza. Moreover,
 
documentary evidence confirms that Pomeroy had access to the tapes
prior to trial. Pomeroy wrote to the prosecutor on March 8, 1989,
expressing his understanding that "you will have copies of the . . .
audio recordings for our review sometime next week," and, when Lema
received Pomeroy's files in fall 1989, the files contained a partial
transcript of the tapes.

 18

silence at trial, but merely pointed out, as evidence of Lema's
 

complicity, that Lema was present and remained silent while both drug

transactions were carried out by Souza. Such evidence is both admis-

sible and potentially probative. See United States v. Ortiz, 966 F.2d
 

707, 714 (1st Cir. 1992) (defendant's silent presence at drug transac-

tion "patently implied participation" where surrounding circumstances

indicated knowledge thereof). The cases Lema cites, United States v.
 

Cox, 752 F.2d 741, 745 (1st Cir. 1985), and United States v. Skandier,
 

758 F.2d 43, 45-46 (1st Cir. 1985), are readily distinguishable; both

found prosecutorial misconduct where the Government asked the jury to

consider how a defendant "explained" certain evidence, a clearly
 

impermissible reference to the defendant's silence in the trial
 

setting.10 As Lema's claim misapprehends the prosecutor's state-
 

ment, we reject it.

 Lema's final claim is that the attorney who represented him at

the sentencing hearing rendered ineffective assistance by failing to

object to the district court's finding that the conspiracy to distrib-

ute involved eleven kilograms of cocaine. Lema argues that only four

kilograms of cocaine changed hands while he was present; the other

 

10United States v. Buege, 578 F.2d 187 (7th Cir.), cert. denied, 439
 
U.S. 871 (1978), is also distinguishable: there the prosecutor, at
closing argument, repeatedly used the term "uncontradicted testimony,"
to refer to testimony which only the defendant was in a position to
contradict. The court found that the prosecutor's references were
"manifestly intended" to call attention to the defendant's failure to
testify. Id. at 188. In Lema's case, by contrast, the prosecutor's
 
reference to Lema's silence plainly called attention to the defen-
dant's silence at the scene of the crime.
 

 19

seven kilograms were part of a deal negotiated by Souza outside Lema's
 

presence, and, in any event, only four of these seven kilograms were

ever accounted for by the police. The claim is baseless.

 The evidence adduced at trial and at sentencing including the

fact that Lema was with Souza at the scene of both cocaine exchanges

 would have supported a reasonable inference that Lema and Souza

were coconspirators, chargeable with all intended distributions
 

negotiated by either conspirator. See United States v. Bello-Perez,
 

977 F.2d 664, 673 (1st Cir. 1992); United States v. Moreno, 947 F.2d
 

7, 9 (1st Cir. 1991). It is immaterial that the police recovered only

a portion of the cocaine Souza agreed to deliver. Id.
 

 We have combed Lema's pro se filings for other assignments of
 

error; none merit discussion.

 Affirmed.
 

 20