**UNITED STATES of America**

v.

**Joseph LORE.**

**Criminal No. 96–359 (JHR).**

United States District Court, D. New Jersey.

Oct. 30, 1998.

---

Faith S. Hochberg, United States Attorney, By Ronald D. Wigler, AUSA, Office of United States Attorney, Newark, NJ, for U.S. Government.

Jay Goldberg, P.C. (Debra A. Karlstein, of counsel), Bronson & Leemon, LLP, New York City, NY, for Defendant.

RODRIGUEZ, District Judge.

Defendant Joseph Lore and two co-defendants were indicted in June of 1996, and charged with loansharking activity from 1987 through 1991. Specifically, the indictment contained counts for conspiracy to make extortionate extensions of credit in violation of 18 U.S.C. § 892 (Count I based on six loans); conspiracy to collect extensions of credit by extortionate means in violation of 18 U.S.C. § 894 (Count II based on six loans); making an extortionate extension of credit in violation of 18 U.S.C. § 892 (Counts III and IV based on two loans); and collecting an extension of credit by extortionate means in violation of 18 U.S.C. § 894 (Counts V, VI and VII based on three loans). On June 18, 1997, and after a four week trial, a jury returned verdicts of guilty on all counts against all three defendants.[1] On April 27, 1998, Lore was sentenced to prison for a term of fifty-one months on each Count, to be served concurrently. He was also ordered to pay restitution to the United States in the amount of $20,000.

Defendant Lore filed a motion for a new trial, pursuant to 28 U.S.C. § 2255. This motion, which was based on an ineffective assistance of counsel claim, raised troubling questions regarding the effectiveness of his defense counsel, the ethical propriety of counsel's admitted actions, and possible violations of the defendant's constitutional rights. For these reasons, this court ordered a full evidentiary hearing, which was held on June 8, 1998.

Due to defense counsel's failure to vindicate defendant's constitutional right to testify, and for the reasons expressed herein, a new trial under 28 U.S.C. § 2255 must be granted.

## I. ISSUES

This ineffective assistance of counsel claim raises unanswered questions of constitutional proportions. The core issue presented can be stated as this: does a non-testifying criminal defendant who remains silent as the defense rests its case, waive his admittedly-known right to testify when he is unaware that he can overrule the tactical decision by his attorney not to have him testify? This issue generates peripheral questions as to the proper involvement of the trial court and defense counsel. Specifically, what role, if any, should (or must) a trial court play in assuring, on the one hand, that a defendant knows his right to testify and that any waiver is knowing and intelligent, but on the other, steering well clear of any intrusion into the attorney-client relationship, and the more fragile right *not* to testify? And does defense counsel's failure to inform a defendant that it is defendant's decision whether or not to testify fall outside the bounds of professionally competent assistance in support of an ineffective assistance of counsel claim?

## II. FACTS

During the four week trial which resulted in Joseph Lore's conviction for his alleged involvement with the extension and collection of credit by extortion, the government offered a witness-informant, John Antos, who testified extensively to receiving two illegal loans through Giacomo "Jake" Guagliardo, an owner of Grace's Luncheonette in Bayonne, New Jersey, and one of the two other co-defendants. Antos testified that although Guagliardo physically extended the moneys to him, it was in fact Joseph Lore who was the true backer of these loans. In fact, Antos recounted the two times he received the loans in Lore's presence, and Lore's instructions that he pay every week, but even if he could not, to at least stop by the luncheonette and have a cup of coffee. Only once, however, in multiple tape recordings offered by the government documenting these activities, was Lore caught on tape. On that tape, Lore is heard saying that he has nothing to do with Antos' outstanding

---

**1.** After conviction and pursuant to Rule 29 of the Federal Rules of Criminal Procedure, Counts V, VI and, in part, VII were dismissed on April 24, 1998. *United States v. Lore*, 4 F.Supp.2d 352 (D.N.J.1998). This court held that the initial threat made when extending credit (and which formed the basis for the § 892 convictions) does not 'carry over' to support a § 894 conviction. Thus, because the loans, with one exception, which supported the § 894 convictions were collected without any further threats, Motions for Judgment of Acquittal were granted as to Counts V, VI, and in part, to Count VII.

loan, but that he would speak to Guagliardo, and that the loan balance could be reduced thereby saving Antos approximately $500. (Tape Recordings between Joseph Lore & John Antos, October 16, 1991). On several other tapes, the government alleges that Lore is referred to as 'the other guy' in incriminating references.

The government also offered the testimony of an undercover detective, Dennis Vecchiarelli, who received four different loans from Guagliardo. He testified that on one occasion he witnessed Lore place a white object, possibly an envelope, on the counter in Grace's, the luncheonette owned by Guagliardo. Guagliardo later went over and apparently picked up the object and motioned for Vecchiarelli to come to the back work area. At that point, a second usurious loan was extended to Vecchiarelli. The inference of this testimony was that the white object dropped off by Lore contained the loan moneys. However, during the disbursement of the money, Guagliardo specifically asked Vecchiarelli not to tell Lore about the loan, because he had to go through other people for this money. (Transcript, June 5, 1997, 45–48).

At trial, Lore did not testify and was convicted. He now claims that his privately-retained attorney, Dennis McAlevy, prevented him from doing so on the last day of the defense's case. Defendant does not feign ignorance of his right to testify; rather he claims ignorance of his right to overrule trial counsel during the course of litigation regarding this right. Notably, never during the course of the four week trial did the Defendant bring to the court's attention his desire to testify or any disagreement with counsel.

What distinguishes this case from the ordinary is the exceptional evidence that Defendant now brings forward to prove that his constitutionally-guaranteed right to testify was denied by his own counsel. At the post-trial hearing on this motion, Defense Counsel McAlevy[2] admitted under oath, that "[t]here's no question about the fact that he wanted to testify and I didn't want him to, so in that context there's no question I coerced him." (Hearing Transcript, June 8, 1998, 88–89). By his own admission, McAlevy "never explained to Lore that he had a constitutional right to testify in his own defense, that he could overrule my judgment, or that the decision to testify was his to make." (McAlevy Aff. ¶ 9). Rather, he explained, "I called the shots in the case. I made all policy decisions and that it was, it's my case. He's my client. He listens to me."[3] (Hearing Transcript, June 8, 1998, 15).

Some of these admissions were substantially corroborated by two other attorneys for a co-defendant. For example, one co-defendant's attorney, Thomas Cammarata, stated under oath that Lore expressed to him his desire to testify 'on a number of occasions,' and that in fact a session was scheduled to prepare Lore to testify, but that session was never held. (Cammarata Aff. ¶¶ 3–5). Cammarata's associate, Jeffrey Garrigan, recounted an incident between Lore and his attorney in the halls of the courtroom during a break in the trial. During that incident, Lore again expressed his desire to testify, but McAlevy refused to put him on the stand. (Garrigan Aff. ¶¶ 5,6). Garrigan recounted the incident at the evidentiary hearing in the following words:

Q: Can you describe that conversation?

A: Sure. My recollection of it was it was the Thursday that we were on the defense case, the week before the case ended. I think it was the 12th of June, the conversation was out at the end of the hallway,

---

**2.** The defendant's attorney, Mr. Dennis McAlevy, is an attorney in private practice with over thirty years trial experience. (McAlevy Aff. ¶ 8).

**3.** In explaining his conduct in this case, Mr. McAlevy states:

[t]he government's case against Lore was weak, and I believed that Lore had a good chance of an acquittal. I felt that I, not Lore, had the right to decide whether he would take the stand. Therefore, I ignored his stated desire to testify and refused to call him as a witness during the presentation of his defense case, although I called several other witnesses. (McAlevy Aff. ¶ 8).

While this court declines to pass judgment on the ethical propriety of defense counsel's actions and failures to act in this case, this opinion will be referred to the Chief Judge in accordance with Local Rule 104.1(e)(2).

if you go out the door, make a right-hand turn at the end of the hallway. It was a few minutes before we started court that day, I think we were starting at 9:30, so it was like maybe five minutes before we went into the courtroom. We were, myself and Mr. McAlevy were just discussing some things about testimony and who was going to testify. And Mr. Lore come down the hallway with us, talking about some other things and then he started, Joe said to Dennis, when am I going to testify? He said you're not testifying. He said what do you mean I'm not testifying? And he said you're not taking the stand, I'm not putting you on the stand. And then he asked why, he said because you're going to get killed. And Joe said, but I want to testify. And he said, look, and I'm leaving out some of the choice words that Mr. McAlevy uses, used repeatedly, and at one point he said, well, I want to testify. I didn't do anything, how could he kill me on cross-examination, that was Mr. Lore. He [McAlevy] said, look, we got this case won. You're not testifying. And at one point he just turned around, walked away, I think somebody was actually calling us into the courtroom, it was right around 9:30, he just turned his back on Mr. Lore and walked away. And Mr. Lore put his hands up, looked at me like what's going on here, what am I doing, what's going on. I didn't say anything to him.

(Transcript, June 8, 1998, 112–13.)

Had Mr. Lore been permitted to testify, he claims he would have been able to testify to the following facts:

1. That he has known John Antos for many years as a patron of Grace's luncheonette in Bayonne. That he further knew John Antos as the neighbor of his brother, as well as from playing cards with him on occasion at the Moose Lodge in Bayonne.

2. In the summer of 1986, Antos approached him at the lodge and told him that he needed money for his tree trimming business. Although he had tried to borrow the money from Jake Guagliardo, the owner of Grace's luncheonette, Guagliardo was reluc-tant to make the loan because Antos had bounced checks used to pay his tab at Grace's. Antos asked Lore to 'vouch' for him to Guagliardo.

3. When Lore saw Guagliardo, he told him that Antos was a good fellow and asked if he could help Antos out with a loan. According to Lore, he agreed to repay the loan if Antos did not pay.

4. When Antos came to the club to pick up the money, Guagliardo told him that he agreed to make the loan because Lore 'OK'd' it. Lore also told Antos to be sure to see Guagliardo every week, even if he could not make a payment, because he was responsible if Antos did not pay.

5. The money that Guagliardo loaned to Antos did not come from him. Nor did Lore receive any money that Antos repaid to Guagliardo, his only role was to guarantee payment in the event of Antos' default.

6. To the best of Lore's knowledge, the first loan was fully repaid. In the fall of 1988, Guagliardo approached him at Grace's and told him that Antos wanted a second loan, and asked if Lore would 'OK' this one as well. He agreed to back this loan as well, although his role was limited in the same manner he backed the first loan.

7. Several months later, Lore was eating in Grace's when Guagliardo mentioned that Antos was falling behind in this payments, and not coming to see him each week. Subsequently, Lore mentioned to Antos on several occasions that he should catch up on his payments to Guagliardo.

8. On October 16, 1991, Antos flagged down Lore a block or two away from his house. Antos informed him that he still owed $1,500 and asked if he thought Guagliardo would take $1,000 as full payment. Lore agreed to speak with Guagliardo to ask, as a favor, whether he would take the $1,000 and forgive the outstanding balance.

9. The next morning, he saw Guagliardo when he went to eat at Grace's, but he forgot to mention Antos' loan. When he heard nothing about it, Lore assumed Antos and Guagliardo had worked something out.

10. With respect to Dennis Vecchiarelli, an undercover detective, Lore claims he only met him once while playing cards at Mario Lammano's social club in Bayonne. He spoke with Dennis briefly that evening about a restaurant in Caldwell, and some additional small talk.

11. Lore was not aware that Guagliardo had loaned money to Vecchiarelli, and that he had nothing whatsoever to do with those loans.

(Lore Aff., dated April 9, 1998).

Lore now argues that he was denied effective assistance of counsel when his attorney prevented him from testifying in his own defense, and explain his innocent relation to Antos' loans and the loansharking activities in general.

The Government responds by maintaining that Lore's tale is a post-conviction fabrication, concocted simply to support this ineffective assistance of counsel claim. Were Lore's story true, the government alleges, at the very least it would have been brought out during the extensive cross-examination of Antos, which still would have avoided putting Lore on the stand. Moreover, had Lore testified as he allegedly wanted to, the government maintains that it had at its disposal a host of materials ready for cross-examination and impeachment, should Lore deny his loansharking involvement on the stand.[4]

The government also notes that Lore never indicated his disagreement with trial counsel, and in fact demonstrated his independence from him by contacting his first counsel, Larry Bronson, prior to trial. In any event, the government maintains that McAlevy's strategic decisions (which Lore implicitly acquiesced to) do not amount to ineffective assistance, but even if they did, there was no prejudice to the defendant. According to the government, the result of the trial would have been the same in either case.

4. It should be noted that Lore has no prior criminal record. In fact, he is licensed as a Pier Superintendent and as a Hiring Agent by the Waterfront Commission of New York Harbor,

## III. DISCUSSION

### A. The Right to Testify

█ It is now firmly established in American jurisprudence that a criminal defendant has a right to testify on his or her behalf. *Rock v. Arkansas*, 483 U.S. 44, 49–53, 107 S.Ct. 2704, 2708–10, 97 L.Ed.2d 37 (1987). This was not always the case. At common law, all parties to litigation were disqualified from testifying because of their inherent self-interest in the outcome. *Id.* Nonetheless, this general rule of incompetency gave way to a rule of competency, as the Supreme Court recognized that there is "no rational justification for prohibiting the sworn testimony of the accused, who above all others may be in a position to meet the prosecution's case[.]" *Ferguson v. Georgia*, 365 U.S. 570, 582, 81 S.Ct. 756, 763, 5 L.Ed.2d 783 (1961). Rooted in the Fourteenth Amendment's guarantee of due process, the compulsory process clause of the Sixth Amendment, and as a necessary corollary to the Fifth Amendment's guarantee against self-incrimination, this right to testify is clearly one of constitutional magnitude and import. *Rock*, 483 U.S. at 53 n. 10, 107 S.Ct. 2704, *citing Nix v. Whiteside*, 475 U.S. 157, 164, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986); id., at 186, n. 5, 106 S.Ct., at 1004, n. 5 (*BLACKMUN*, J., concurring in judgment); *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983) (defendant has the "ultimate authority to make certain fundamental decisions regarding the case, as to whether to ... testify in his or her own behalf"); *Brooks v. Tennessee*, 406 U.S. 605, 612, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972) ("Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right").

### 1. The Decision to Testify

Given the importance of this undisputed right, the underlying question is who decides whether a defendant will testify, and if not, how can this constitutional right be waived? As the Eleventh Circuit recognized in an in

and is employed at the Military Ocean Terminal in Bayonne, New Jersey. Persons with criminal histories are generally barred from such employment.

banc opinion, criminal defendants "possess essentially two categories of constitutional rights: those which are waivable by defense counsel on the defendant's behalf, and those which are considered 'fundamental' and personal to the defendant, waivable only by the defendant." *United States v. Teague,* 953 F.2d 1525, 1531 (11th Cir.1992)(in banc). The Third Circuit recognized in *United States v. Pennycooke* that the right to testify is personal to the defendant, and thus, only the defendant may waive it. 65 F.3d 9, 10 (3d Cir.1995). Every other Circuit Court to consider this question concurs in this result. *See United States v. McMeans,* 927 F.2d 162, 163 (4th Cir.1991); *Jordan v. Hargett,* 34 F.3d 310, 312 (5th Cir.1994), *vacated without consideration of this point,* 53 F.3d 94 (5th Cir.1995) (in banc); *Rogers–Bey v. Lane,* 896 F.2d 279, 283 (7th Cir.1990), *cert. denied,* 498 U.S. 831, 111 S.Ct. 93, 112 L.Ed.2d 65 (1990); *United States v. Bernloehr,* 833 F.2d 749, 751 (8th Cir.1987); *United States v. Joelson,* 7 F.3d 174, 177 (9th Cir.1993); *Teague,* 953 F.2d at 1532 (11th Cir.); *United States v. Ortiz,* 82 F.3d 1066, 1070 (D.C.Cir.1996); *see also Lema v. United States,* 987 F.2d 48, 52 (1st Cir.1993) (assuming without deciding that right to testify may not be waived by counsel).

### 2. Waiving the Right to Testify

█ While there is unanimity among the Circuit Courts as to the personal nature of the right to testify, disagreement arises over how to protect or waive that right. Generally, a criminal defendant's waiver of fundamental constitutional trial rights must be knowing and intelligent. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 241, 93 S.Ct. 2041, 2055, 36 L.Ed.2d 854 (1973). But who must ensure that this stringent standard for waiver is met? Courts have attempted to answer this question by assigning responsibility to one of three individuals: a) the trial judge; b) the defendant's attorney; or c) the defendant.

### (a) The Role of the Trial Judge

Because of the fundamental nature of the right to testify, and its status as a personal Constitutional right which only the defendant may waive, some state courts require that the trial judge conduct an on-the-record colloquy with the defendant to ensure that any waiver of this right meets constitutional muster. *See, e.g., People v. Curtis,* 681 P.2d 504, 514 (Colo.1984)(trial court must assure that waiver of the right to testify is voluntary, knowing and intentional by advising defendant outside the presence of the jury); *Culberson v. State,* 412 So.2d 1184, 1186–87 (Miss.1982)("We suggest to the trial judges of the state that, in any case where a defendant does not testify, before the case is submitted to the jury, the defendant should be called before the court out of the presence of the jury, and advised of his right to testify."); *State v. Neuman,* 179 W.Va. 580, 371 S.E.2d 77, 81–82 (1988)(holding that the decision to testify is so fundamental that procedural safeguards must be employed on the record to insure that defendant's waiver was made voluntarily, knowingly, and intelligently); *Tachibana v. Hawaii,* 79 Hawai'i 226, 234, 900 P.2d 1293, 1301 (1995).

Despite these state court opinions, the Third Circuit, and every Circuit Court to consider this issue, has declined to require that a trial court explain the right to testify or verify that a non-testifying defendant has waived this right voluntarily. *Pennycooke,* 65 F.3d at 11; *see Teague,* 953 F.2d at 1533 n. 8 (11th Cir.1992); *United States v. Edwards,* 897 F.2d 445, 447 (9th Cir.1990), *cert. denied,* 498 U.S. 1000, 111 S.Ct. 560, 112 L.Ed.2d 567 (1990); *United States v. McMeans,* 927 F.2d at 163 (4th Cir.); *Ortega v. O'Leary,* 843 F.2d 258, 261 (7th Cir.1988); *Siciliano v. Vose,* 834 F.2d 29, 30 (1st Cir. 1987); *Bernloehr,* 833 F.2d at 752 (8th Cir. 1987); *United States v. Janoe,* 720 F.2d 1156, 1161 (10th Cir.1983), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1310, 79 L.Ed.2d 707 (1984).

One compelling reason for this majority rule is that the Supreme Court described the right to testify as "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Rock,* 483 U.S. at 52, 107 S.Ct. at 2709. The mutually exclusive nature of these rights prevents a trial court from inquiring into either one, for fear that such an inquiry will prejudice the free will choice of the defendant to waive one or the other of these rights.

The fact that a criminal defendant, depending on the facts and circumstances of the case, reasonably could choose either to testify or not to testify, necessarily means the determination of whether the defendant will testify is an important part of trial strategy best left to the defendant and counsel without the intrusion of the trial court, as that intrusion may have the unintended effect of swaying the defendant one way or the other.

*Pennycooke,* 65 F.3d at 11.

The Third Circuit recognizes that "in exceptional, narrowly defined circumstances, judicial interjection through a direct colloquy with the defendant may be required to ensure that the defendant's right to testify is protected." *Id.* at 12. The case that the Third Circuit described as the exception involved a defendant who repeatedly interrupted the trial to express his desire to testify. *Id.* "In such a case, it may be advisable that the trial court inquire discreetly into the disagreement and ensure that constitutional rights are not suppressed wrongly." *Id.* at 13. *See also Ortega,* 843 F.2d at 261 (where defendant has expressed his desire to testify to the court, trial judge should make inquiry); *Ortiz,* 82 F.3d at 1071 (trial judge should inquire into waiver where "there appears to be no rational explanation for the decision" not to testify).

The case at hand is not exceptional in that defendant Lore never expressed his desire to testify to the court, nor was any disagreement with counsel apparent during the proceedings. Defendant Lore does not specifically argue that this court erred in not inquiring into whether he knowingly and intelligently waived his right to testify. His argument suggests that he was not permitted to testify because his attorney's strong will overpowered his own. Moreover, Lore notes that although aware of his right to testify generally, he was unaware that it was his decision to make and not his attorney's. The failure of McAlevy to so inform him and the resulting consequence that he did not testify demonstrates, according to Lore, that his counsel was ineffective.

The resolution of whether Lore can state a cognizable claim of ineffective assistance of counsel thus turns on whether it is solely the responsibility of defense counsel to inform defendant not only of his right to testify, but also that the decision is his to make; or in the alternative, whether the defendant has some affirmative duty to inform the court of his desire to exercise his known right to testify, despite his attorney's disagreement and unwillingness to call him to the stand.

(b) The Role of Defense Counsel

The Third Circuit did indicate in *Pennycooke* that "[t]he duty of providing such advice [on whether to testify] and of ensuring that any waiver is knowing and intelligent rests with defense counsel." 65 F.3d at 12. Indeed, Mr. Pennycooke lost his appeal at least in part because of his failure to "point[ ] to [anything] in the record to support a conclusion that his attorney did not advise him of his right to testify." *Id.* These statements support the view that in the Third Circuit, it is primarily defense counsel's obligation to ensure the right to testify, and not the defendant's affirmative duty to make his wishes known to the court. At least one district court case decided in the Third Circuit supports this interpretation. Although decided prior to *Pennycooke,* the district court in *United States v. DiSalvo* found that a criminal defendant did not make a free and meaningful decision not to testify when his attorney did not advise him of his right to testify, nor did he provide him with enough relevant information to enable him to make an informed decision. 726 F.Supp. 596, 598 (E.D.Pa.1989). This failure undermined the government's contention that DiSalvo 'waived' his right to testify, and instead supported his claim of ineffective assistance of counsel. *Id.* at 597–98. Other Circuit Courts also place with defense counsel the responsibility of informing the defendant of his right to testify and ensuring that any waiver of that right meets constitutional muster. *See e.g., Teague,* 953 F.2d at 1533 & n. 8 (11th Cir.); *Ortega,* 843 F.2d at 261 (7th Cir.); *Siciliano,* 834 F.2d at 30 (1st Cir.); *Janoe,* 720 F.2d at 1161 (10th Cir.).

The practical difficulty in placing the burden of ensuring that a waiver is both 'knowing and intelligent' entirely with defense counsel is that there is little recourse to

prevent non-testifying defendants from repeatedly claiming, as in this case, that their right to testify was denied. While a criminal defendant often has good reasons not to testify during trial, after conviction, the impulse to claim that his attorney 'would not let him' becomes compelling. A defense which fails after invoking one constitutional right should not get a second bite at the apple by invoking its converse. "Fundamental unfairness would characterize a process that let defendants have one trial based on their lawyer's strategy and another trial based on their own." *Martinez*, 883 F.2d at 761 (citing *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2065–66).

Yet any suggestion as to a cure for this dilemma threatens to drag the impartial judge into the depths of strategic trial decisions and tactics. For example, it is well recognized that the accused has the authority to make certain fundamental decisions regarding the case. *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir.1993), *cert. denied*, 510 U.S. 1019, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993). But at each point during a trial that a strategic decision of constitutional proportions is made, should a court inquire into the nature and reason for that decision? For the same reasons that the Third Circuit refused to require an on-the-record waiver of the right to testify, a court cannot adequately ensure, until after the fact of a conviction or acquittal, whether defense counsel adequately allocated those decisions which are properly for the attorney, and those that the client must make.

### (c) The Role of the Defendant

In the Ninth Circuit, a presumption of waiver arises with a defendant's silence and implicit assent to his lawyer's tactical decision not to have him testify. *Martinez*, 883 F.2d 750 (9th Cir.1989), *vacated on other grounds*, 928 F.2d 1470, *cert. denied*, 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991); *Edwards*, 897 F.2d at 446–47. The Court in *Martinez* confronted a similar situation to the one before this court. During Martinez's trial for importing heroin into the United States, he insisted to his privately retained attorney that he wished to testify, but his trial attorney refused to permit him.

*Martinez*, 883 F.2d at 752. After conviction, Martinez moved for a new trial on the ground that he was denied his fundamental constitutional right to testify by the actions of his lawyer. *Id.* The defense attorney substantially corroborated Martinez's account of who made the decision for defendant not to testify and how that decision was made. *Id.*

Writing for the majority, Judge Noonan thoughtfully considered both the nature and scope of the right to testify, and compared this right with others guaranteed by the Constitution. *Id.* at 756–59. The analysis led the court to decide that unlike the right to counsel, the waiver of which must be done on the record, the waiver of the right to testify could be inferred from the defendant's conduct and a silent record. *Id.* at 758. In sum, the court stated:

> That [Martinez] knew that the right [to testify] existed, i.e., that he knew the state could not bar him from being a witness, is plain from his colloquies with his lawyer. Educated by television and past courtroom experience of his own, Martinez had seen criminal defendants take the stand. He knew he had a right to be heard if he chose. His lawyer did not deny that he did. The defendant's knowledge of his right led him to insist. Respect for his lawyers's judgment eventually led him not to persist.

*Id.* at 761.

According to the majority in the Ninth Circuit, because the defendant did not lose the right to testify through prosecutorial or judicial action and because in fact the court was unaware of his frustrated attempt to testify, that right was waived when the defendant failed to take the witness stand in his own defense, and remained silent as his attorney rested his case.

Nonetheless, the dissent in *Martinez* roundly criticized the majority for turning what should have been a knowing and intelligent waiver into, in reality, a demand rule that requires a defendant wishing to testify but not permitted by his lawyer to "ignore the admonishments of counsel, interrupt the trial proceedings, and interject himself, uninvited into the fray." *Id.* at 770 (Reinhardt, J., dissenting). The reality of such an out-

burst happening, which ordinarily would result in quick reprimands and sometimes banishment from the courtroom, is not likely. Other courts have recognized these realities and thus, absent corroborating evidence of waiver, have refused to infer a waiver from a defendant's silence. *See Brown v. Artuz,* 124 F.3d 73 (2d Cir.1997); *Underwood v. Clark,* 939 F.2d 473, 476 (7th Cir.1991); *U.S. v. DiSalvo,* 726 F.Supp. 596 (E.D.Pa.1989); *Tachibana v. State,* 79 Hawai'i 226, 233, 900 P.2d 1293 (1995).

■ The testimony and strong evidence produced during the evidentiary hearing on this motion, support the conclusion that Dennis McAlevy prevented his client, Joseph Lore, from testifying. Given this fact, in addition to the language employed in *Pennycooke,* the authority followed by most Circuit Courts which have considered this question, and the practical realities of trial explained above, this court cannot infer a waiver of the right to testify from Lore's silence in this compelling case. The Supreme Court has pointed out that "courts indulge every reasonable presumption against waiver of fundamental constitutional rights and that [the Supreme Court does] not presume acquiescence in the loss of fundamental rights." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (citations omitted). To find a waiver of the right to testify under the circumstances of this case would contravene a reasonable presumption against waiver and constitute an acceptance of the unknowing loss of a fundamental constitutional right.

### 3. Counsel's Assistance in this Case

■ It was the responsibility of defense counsel Dennis McAlevy to inform his client of both the nature and existence of the right to testify, and that that right was solely his to invoke or waive. As the in banc Eleventh Circuit instructed in *Teague:*

> [I]f defense counsel refused to accept the defendant's decision to testify and would not call him to the stand, counsel would have acted unethically to prevent the defendant from exercising his fundamental constitutional right to testify. Alternatively, if defense counsel never informed the defendant of the right to testify, and that the ultimate decision belongs to the defendant, counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing and voluntary.

953 F.2d at 1534.

This responsibility is a component of counsel's effective assistance, and by his own admission, Dennis McAlevy failed miserably in meeting this responsibility.

### B. Ineffective Assistance of Counsel

■ As a result of defense counsel's failure, the defendant's claim of ineffective assistance of counsel must be reviewed under the two prong test developed in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defendant must prove that the errors were so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The first prong of *Strickland* requires a defendant to show that his or her attorney's performance was deficient. To satisfy the deficient performance test, defendant must identify the acts or omissions of counsel that were not the result of reasonable professional judgment. *Zettlemoyer v. Fulcomer,* 923 F.2d 284, 295 (3d Cir.1991). The court must then determine, in light of all the circumstances, whether "the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 295. In reviewing counsel's performance, the court must be highly deferential. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. The second prong requires defendant to show that his or her performance prejudiced the defense. Thus, defendant must show that there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

■ The Court finds that defense counsel's performance in this case fell "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. It was the defendant's right ultimately to decide whether or not he would testify, and counsel's failure to ensure . the defendant's waiver of this right was voluntary and knowing was not reasonable. "[B]y not protecting the defendant's right to testify, defense counsel's performance fell below the constitutional minimum, thereby violating the first prong of the Strickland test." *Teague,* 953 F.2d at 1534. Even given the strong presumption that counsel rendered reasonable professional assistance, *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, and even if the decision not to testify was a reasonable one in this case,[5] the failure to permit the defendant to make that decision with the advice of counsel, rather than a directive from counsel, flaunted both the case law cited above and the professional standards of the bar. *See* MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.2(a) & cmts. (1995)("In a criminal case, the lawyer shall abide by the client's decision ... whether the client will testify."); ABA STANDARD FOR CRIMINAL JUSTICE, 4–5.2(a)(iv)(3d ed.1993)("whether to testify in his or her own behalf" is a decision "to be made by the accused after full consultation with counsel").

The evidence is strong that Lore both wanted to testify and insisted to his lawyer that he do so. During the evidentiary hearing on this question, Lore was questioned regarding the right to testify, and his right to overrule his lawyer.

Q: Did you know—you knew of your right to testify, right? You understood you had that right?

A: I knew I could testify, yes.

Q: What did you know—

A: That's why I was asking him [about testifying].

Q: What did you know about your right to override your lawyer's decision?

A. I didn't know nothing about that.

Q: What?

A: I didn't know nothing about that you could overrule or get up in court and say I want to testify, I didn't know nothing about that.

Q: Did Dennis ever tell you that?

A: No, sir.

Q: Did he ever inform you of your rights?

A: No.

(Transcript, June 8, 1998, 155)

This testimony is consistent with each of the other witnesses who testified at the hearing, including Lore's own attorney.

The second prong of *Strickland* is also satisfied because the defendant suffered prejudice as a result of his counsel's failures. The testimony Lore now proffers could have provided a rational explanation for his involvement in what the Government alleges were extortionate activities. There is at least a reasonable probability that but for defense counsel's refusal to permit defendant to testify, the result of the trial could have been different for Lore.

The evidence against Lore was the weakest of the three co-defendants. The evidence consisted of Lore's own voice on one tape speaking in an ambiguous manner with the witness-informant, a few other references to him on other tape recordings, none of which were exceptionally incriminating, and the testimony of an undercover detective that Lore placed a white object on the counter at the luncheonette before the detective received a loan.[6] Antos, the witness-informant, also testified that Lore was present when he re-

---

5. This court offers no opinion on whether or not it was reasonable for Lore not to testify. Indeed, McAlevy's *advice* not to testify would almost certainly have fallen into the "wide range of professionally competent assistance," *Zettlemoyer v. Fulcomer,* 923 F.2d at 295, thereby undercutting any ineffective assistance of counsel claim. But this was not the case here. While reasonable minds could differ as to McAlevy's tactical decision not to have Lore testify, this court does not

believe that a defense attorney can take away from a defendant as fundamental a right as the right to testify.

6. When the detective received the proceeds of the loan allegedly left on the counter by Lore when he placed the white object down, Guagliardo specifically told him not to tell Lore about this loan, implying that it came from someone else.

ceived his loans. Lore's own testimony could have explained these things or at least contradicted the testimony of both Antos and the undercover detective. It is not for the court to decide whom the jury would believe when faced with the contradiction. It is enough that the unprofessional errors made by counsel on matters of constitutional import were "sufficient to undermine confidence in the outcome" of this case. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

"The testimony of a criminal defendant at his own trial is unique and inherently significant. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Nichols v. Butler,* 953 F.2d 1550, 1553 (11th Cir.1992)(quoting *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961)). Lore had a right to speak for himself, a right which was denied by the actions of his counsel. The jury verdict in this case may have been different but for the suppression of a fundamental constitutional right. Regardless of the fact that the prosecution was without fault in this case, the vindication of Constitutional rights is worthy of a new trial.

For these reasons and under these circumstances, this Court holds that defendant received ineffective assistance of counsel.

## IV. CONCLUSION

For the reasons set forth above, defendant's petition for a new trial under 28 U.S.C. § 2255 is hereby granted.

An appropriate order will be entered.

### ORDER

For the reasons expressed in this court's Opinion filed even date,

**IT IS ORDERED** on this 30th day of October 1998, that Defendant's petition for a new trial under 28 U.S.C. § 2255 is hereby *GRANTED.*